Filed 3/21/22  P. v. Purcell CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C092783 |
| Plaintiff and Respondent, | (Super. Ct. No. 79077) |
| v. | |
| HENRY PURCELL, | |
| Defendant and Appellant. | |

In 1987, the trial court found defendant Henry Purcell not guilty by reason of insanity of assault with intent to commit rape and ordered him committed to a state hospital for a maximum of six years.  The trial court has granted successive petitions extending defendant's commitment by two-year terms.  In 2020, the People filed the latest such petition.  Upon a jury verdict that defendant suffered from a mental disease, defect, or disorder, and that, as a result thereof, he posed a substantial danger of physical harm to others and had serious difficulty controlling his dangerous behavior, the trial

1

court granted the petition, extending defendant's commitment by two years.  On appeal, defendant asserts the verdict is not supported by substantial evidence.  We affirm.

## I. BACKGROUND

A 1987 information charged defendant with assault with intent to commit rape. (Pen. Code, § 220.)[1]  The trial court found defendant not guilty by reason of insanity and found him to be a danger to the health and safety of others.  The court ordered defendant committed to Atascadero State Hospital for a maximum term of six years pursuant to section 1026.

In 1992, the trial court granted the People's petition pursuant to section 1026.5, subdivision (b)(1) to extend defendant's commitment by two years.  The court has granted numerous successive petitions extending defendant's commitment by two-year terms.  In 2020, the People filed the current petition for another two-year extension.

A. *The Trial Evidence*

Dr. Nilda Diaz, a forensic psychologist for the State Department of State Hospitals, was the only witness at trial.  Diaz testified as an expert in forensic psychology specific to the area of persons pleading not guilty by reason of insanity.

Diaz attempted to meet with defendant to perform a forensic evaluation.  When she introduced herself, defendant said, " 'I already talked to you last night.' "  Diaz had never met defendant before.  Defendant insisted they had talked the previous night and indicated he had no interest in speaking with her.

Although unable to meet with defendant, Diaz prepared a report.  She reviewed hospital documentation and defendant's criminal history.  Before testifying, she also reviewed hospital documentation prepared since she completed her report.

---

[1]  Further undesignated statutory references are to the Penal Code.

2

Diaz described six reports distilled to a statement of stipulated facts upon which she relied. One was a monthly progress note prepared in April 2020 by defendant's treating psychiatrist. Three were monthly progress notes prepared between October 2019 and February 2020 by a clinical social worker. Another was a registered nurse's progress note from January 2020. The last was a rehabilitation therapy assessment prepared by a certified treatment rehabilitation specialist in October 2019.

B.    *Defendant's Diagnoses*

Defendant's primary psychiatric diagnosis was schizoaffective disorder, bipolar type. This is a disorder characterized by psychotic symptoms. "Psychosis is the inability to correctly interpret what's happening in reality." A person experiencing psychosis may misperceive others' behaviors or actions. Such a person may also experience outside stimuli that, in reality, are not there such as auditory, visual, and tactile hallucinations. Defendant had a history of auditory hallucinations; he hears voices telling him to do things, which are known as command hallucinations. Defendant's auditory command hallucinations included voices telling him to harm others and that people are "after him," which Diaz described as paranoid ideation. Defendant believes "everybody is out to harm him, . . . specifically his treatment team."

The bipolar aspect of defendant's diagnosis included symptoms of a mood disorder. Defendant experiences manic episodes that have included hostile and aggressive behavior towards others.

Defendant also had three "underlying diagnoses": cannabis use disorder, alcohol use disorder, and antisocial personality disorder. His use of cannabis and alcohol have both contributed to maladaptive behaviors that had "gotten in the way of him being able to effectively function in society." Defendant was not in remission for his use disorders because he had not completed any treatment. In relation to his past drug use, he had expressed the opinion that there was nothing wrong with him.

3

Antisocial personality disorder "is a pervasive pattern of maladaptive ways of interacting with others in society."  It can manifest itself in disobeying the law and social norms.  Additionally, there is a criterion of antisocial personality disorder including lack of remorse for behaviors that harm others.  Other criteria include social isolation, aggression, and hostility towards the personal space and boundaries of others, and disregard for the health and safety of others.

With regard to her opinion defendant presented a substantial danger of physical harm to others, Diaz looked at three areas in relation to his primary mental illness: (1) defendant's history, (2) defendant's clinical presentation/current functioning, and (3) risk management.

C.    *Defendant's History*

Diaz considered defendant's past diagnoses, past symptoms, past compliance with treatment, and past behavior, including his criminal history.  Defendant had a pattern of "decompensation."  He would go through treatment, but, once unsupervised, he quickly decompensated, meaning his psychotic symptoms escalated, causing him to again pose a risk, and he had reoffended.  Similarly, in relation to defendant's criminal history, he would go through treatment, be released, be rearrested related to his mental illness, and be rehospitalized.  This pattern had occurred on three occasions since 1972.  Defendant's criminal history demonstrated escalation:  "He went from a vehicle theft to a battery on a person.  After that, he was treated and then subsequently re-arrested for a felony assault, likely to produce great bodily injury, an increase in the level of violence that was exhibited even after he was at the state hospital setting.  So a good indicator of potential dangerousness and violence is past behavior, and I took the pattern . . . shown by [defendant], as a main contributor to his current level of dangerousness, if he were to be released without supervision."

4

*D.    Clinical Presentation/Current Functioning*

Defendant continued to be verbally aggressive towards others. He cursed at his treatment team and his peers and made illogical statements that could demonstrate disorganized thinking. His presentation also indicated hallucinations and responsiveness to unseen stimuli, indicating ongoing psychosis. He exhibited poor decisionmaking. He also demonstrated "poor boundaries with others," requiring hospital staff to intervene and redirect him so he would not harm or be harmed by others.

In February 2020, a social worker documented an incident in which defendant took a peer's cup and drank from it without permission. Diaz testified this demonstrated poor decisionmaking skills and inability to make appropriate decisions about others' personal space. This incident "increased his risk for being harmed by others, as well as his reaction to the situation went quickly from making a poor decision to an outburst of aggression towards another person." Defendant's inability to make good decisions would place him and others at a substantial risk of physical harm due to his impulsivity in his interactions with others and his poor perception of others' intent.

A nurse's note from January of 2020 indicated defendant had ongoing delusions and paranoia, responded to auditory hallucinations, cursed at staff, stating, for example, " 'kill the bitch,' " and referred to himself as Jesus Christ. Defendant continued to express delusions and false beliefs. He "quickly resorts to aggressive . . . hostile verbalizations to others that can be perceived as aggressive and potential for danger."

In another documented incident, a social worker tried to redirect defendant when she found him attempting to eat food from the trash. Defendant's response was "very aggressive and hostile." Defendant cursed at the nurse and staff redirected him for his safety and the safety of staff. Diaz considered this additional evidence of defendant's inability to make good decisions regarding health, hygiene, and grooming.

In another incident, when the social worker attempted to perform an annual evaluation, defendant "grumble[d] under his breath . . . and his body posture was leaning

5

forward with clenched hands and he ended the interaction with 'fuck off,' while fingers imitated a gun and made a gesture to simulate shooting" the social worker. This was further support for Diaz's opinion that defendant's interactions tended to be aggressive and hostile and put others at risk of physical harm. Defendant "continues to have the symptoms of misinterpreting reality, misinterpreting other people's intent, as noted as his paranoia."

A therapist noted defendant had a history of aggression and that he had hit peers. While he did not hit hard, such actions put defendant at risk of being hit back. Diaz opined this supported the conclusion defendant had a pattern of engaging in physical violence toward others. Defendant "tends to be impulsive, aggressive and hostile, which could result in harm to others." Diaz acknowledged defendant had "been free from actual physical assault for four years." However, she opined that "has been more of a result of the structure of the hospital setting and the daily routine of redirection from the staff, that prevent him from having the ability to actually, physically harm others."

*E.     Risk Management*

Defendant had failed to develop mitigating behaviors or skills that would reduce his risk. Defendant had failed to create a relapse prevention plan, he had not developed a positive relationship with, and continued to be paranoid about, his treatment team, and he continued to insist he does not have any mental illness. Diaz characterized this as of great concern. Diaz testified that someone like defendant, who did not believe he had a mental illness, would be unlikely to continue medication if placed in the community. According to the report by defendant's treating psychiatrist, if defendant did not take his medication, he would decompensate and "pose an increased risk of aggression and violence." Diaz testified that, since defendant's 1987 commitment, he had not made any progress in understanding his mental illness, learning how to cope, or developing any plan.

6

*F.    Additional/Interrelated Considerations*

Diaz testified it is essential to go through core treatment to achieve remission. However, defendant did not participate in core treatment therapies.  He was not enrolled in the relapse prevention plan group nor the core groups for awareness of mental illness or substance abuse.  A main criterion for discharge readiness is a patient's "ability to develop insight and awareness into their own mental illness and develop skills in order to manage the symptoms."  Having declined participation, defendant posed "a very, very high risk of decompensation if he were released and he would not meet criteria for a discharge from the hospital."

Defendant complied with his medication program in the hospital but "he requires daily redirection to take that medication.  So without the prompting of staff, it's unlikely."  In the past, when defendant had undergone a change or adjustment in medication, defendant experienced increased episodes of violence and aggression towards peers.  Defendant still experiences psychosis and impairment in his daily functioning despite his medication.

*G.    Diaz's Conclusions*

Diaz concluded defendant still represented a substantial danger of physical harm to others due to his continued symptoms of his severe mental illness.  Diaz further opined defendant had serious difficulties controlling his dangerous behavior.

Explaining her opinion that defendant represented a substantial danger of physical harm to others due to his diagnosis of schizoaffective disorder, bipolar type, Diaz testified:  "Based on my review of his progress and treatment over the past year, or the lack thereof, [defendant] has continued to present with symptoms of psychosis.  As noted in the six different reports . . . , [defendant] has continued to exhibit experience of auditory hallucinations; he has continued to experience paranoid ideation; he has also demonstrated poor reality testing, in that he has not been oriented to what is going on around him accurately; he has also demonstrated what's called disorganized thoughts and

7

disorganized speech, so when staff have attempted to interact with him, his responses do not make sense, logically, to the questions he's being asked. He has also presented with maladaptive behaviors over the past year. Those have included verbal aggression towards peers and staff. He has required daily redirection and supportive interaction by staff in order to complete basic skills of daily living, such as his hygiene and grooming, taking his medications and maintaining appropriate boundaries with his peers, as well as other staff. He's also demonstrated social isolation that has been demonstrated by his poor attendance and engagement in his treatment. He's been noted to only attend and participate in treatment that includes recreation on the unit. . . . [A]ny core treatments that include[] awareness of his mental illness education, awareness of his medication regime, development of coping skills, development of a relapse prevention plan for substance abuse or crises or his mental illness symptoms, he has refused to engage with for the past year. [¶] So due to those listed behaviors and observations, he still represents a substantial danger of physical harm to others, secondary to his severe mental illness, which is schizoaffective disorder."

## H.     *Verdict and Extension of Commitment*

The jury found true the petition's allegation that defendant suffered from a mental disease, defect, or disorder, and that, as a result thereof, he posed a substantial danger of physical harm to others and had serious difficulty in controlling his dangerous behavior. The trial court extended defendant's commitment by two years to August 18, 2022.

## II.  DISCUSSION

Defendant asserts the judgment is not supported by substantial evidence that his mental illness currently causes him serious difficulty controlling dangerous behavior. According to defendant, the prosecution did not provide any evidence to support Diaz's "bare conclusion" that defendant had such difficulty.

Under section 1026.5, subdivision (b)(1), "[a] person may be committed beyond the term prescribed by subdivision (a) only under the procedure set forth in this

subdivision and only if the person has been committed under Section 1026 for a felony and by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others." "The last element also requires proof that the person has serious difficulty controlling his dangerous behavior." (*People v. Williams* (2015) 242 Cal.App.4th 861, 872 (*Williams*).) Defendant only challenges the sufficiency of the evidence with regard to the element addressed to whether his mental illness currently causes him serious difficulty controlling dangerous behavior.

"We review an order to extend commitment under section 1026.5 by applying the substantial evidence test, examining the entire record in the light most favorable to the order to determine whether a rational trier of fact could have found the requirements of the statute satisfied beyond a reasonable doubt." (*Williams, supra*, 242 Cal.App.4th at p. 872.) Substantial evidence is " 'evidence that is reasonable, credible, and of solid value,' " from which a reasonable trier of fact could have made the requisite finding under the applicable standard of proof. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.) " 'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*Ibid.*)

Diaz concluded defendant represented a substantial danger of physical harm to others due to his continued symptoms of his severe mental illness. Diaz further expressly opined defendant had serious difficulties controlling his dangerous behavior. As defendant notes, "expert medical opinion evidence that is based upon a ' "guess, surmise or conjecture, rather than relevant, probative facts, cannot constitute substantial evidence." ' " (*In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1504.) Here, we conclude relevant, probative facts supported Diaz's conclusion.

9

Defendant's primary diagnosis, schizoaffective disorder, bipolar type, is a psychotic disorder. "Psychosis is the inability to correctly interpret what's happening in reality." Defendant has a history of experiencing auditory command hallucinations including voices telling him to harm others and that people are "after him." He currently demonstrates signs of hallucinations and responsiveness to unseen stimuli, indicating his ongoing psychosis. He has poor reality testing and is not accurately orientated to what was going on around him. His bipolar disorder causes him to exhibit hostile and aggressive behavior towards others. He exhibited maladaptive behaviors including verbal aggression.

Defendant's use of cannabis and alcohol have contributed to maladaptive behaviors that had "gotten in the way of him being able to effectively function in society." Defendant has not completed any treatment relative to his use disorders.

Antisocial personality disorder, which defendant has, can manifest itself in disobeying the law and social norms, experiencing lack of remorse for behaviors that harm others, aggression and hostility, and disregard for the health and safety of others.

Defendant shows poor decision making and inability to make appropriate decisions about the personal space of others. His inability to make good decisions would put him, and others, at a substantial risk of physical harm due to his impulsivity and his poor perception of others' intent.

A nurse's note indicated defendant had ongoing delusions, false beliefs, and paranoia, responded to auditory hallucinations, cursed at staff stating, " 'kill the bitch,' " and referred to himself as Jesus Christ. Defendant "continues to have the symptoms of misinterpreting reality, misinterpreting other people's intent." He also had a history of aggression and he hit peers, although not hard. Defendant is impulsive, aggressive, and hostile.

A main criterion for discharge readiness is a patient's "ability to develop insight and awareness into their own mental illness and develop skills in order to manage the

10

symptoms." Defendant failed to develop any sort of relapse plan and continues to insist he does not have any mental illness.

According to Diaz, someone like defendant, who does not believe he has a mental illness, would be unlikely to continue medication if placed in the community. According to the report by defendant's treating psychiatrist, if defendant did not take his medication, he would decompensate and "pose an increased risk of aggression and violence." When defendant has undergone a change or adjustment in medication, he experienced increased episodes of violence and aggression towards peers.

It is essential to go through core treatment to achieve remission. Defendant did not participate in core treatment therapies. Having declined participation, defendant posed a "very high risk of decompensation if he were released."

We conclude the foregoing constitutes substantial evidence amply demonstrating defendant's mental illness currently causes him serious difficulty controlling dangerous behavior. Diaz testified as an expert to that very fact. (Cf. *Williams, supra*, 242 Cal.App.4th at p. 872 ["A single psychiatric opinion that a person is dangerous because of a mental disorder constitutes substantial evidence to justify the extension of commitment"].) Moreover, based on the evidence marshaled *ante*, the jury could reasonably infer that defendant's mental illness, psychosis, command hallucinations, paranoia, misinterpretations of reality and the intentions of others, clear patterns of decompensating, impulsivity and aggression, denial that he has any mental illness, and the likelihood he would not comply with his medication program established defendant's mental illness currently causes him serious difficulty in controlling dangerous behavior. Defendant's history of hitting peers demonstrated serious difficulty controlling dangerous behavior. Moreover, although defendant had "been free from actual physical assault for four years," this "has been more of a result of the structure of the hospital setting and the daily routine of redirection from the staff, that prevent him from having the ability to actually, physically harm others." Defendant's reaction to a social worker attempting to

11

conduct an annual evaluation, clenching his hands, telling her to " 'fuck off,' " and making a hand gesture like shooting a gun at her also illustrates his inability to control dangerous behavior. Defendant has no plan for dealing with his mental illness, psychosis, substance abuse, hostility, and aggression. Substantial evidence supports the jury's verdict.

Defendant attempts to distinguish cases in which substantial evidence supported the determination that the defendant had serious difficulty controlling dangerous behavior. (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1159; *People v. Bowers* (2006) 145 Cal.App.4th 870.) However, for the most part, we find the circumstances in those cases more analogous to defendant's circumstances than distinguishable. Each case obviously involves facts not present here. (*Zapisek, supra,* at p. 1166 [the defendant taped over hospital alarm sensors needed for medical emergencies because he believed he was under surveillance; he also experienced delusions of the same type as those he previously experienced when he assaulted a stranger with a knife believing the stranger was the devil]; *Bowers, supra,* at p. 879 [Bowers told doctors she was able to resist command hallucinations, but "she was not always able to do so, as evidenced by her suicide attempt two months before her interview"].) However, as the People point out, these cases do not establish a minimum showing required to support a conclusion that a patient has serious difficulty controlling dangerous behavior. They establish no more than that, in those cases, substantial evidence supported the findings of the triers of fact.

Defendant also relies on *People v. Galindo* (2006) 142 Cal.App.4th 531. However, the proceedings in the trial court in *Galindo* predated the recognition of the requirement that "section 1026.5, subdivision (b)(1), must be interpreted as requiring proof that a person under commitment has serious difficulty in controlling dangerous behavior." (*Id*. at p. 536.) Thus, "neither the parties, nor the witnesses, nor the court had the opportunity to consider the control issue." (*Id*. at p. 539) Here, Diaz expressly

testified defendant had serious difficulties controlling his dangerous behavior, an opinion we have found to be supported by substantial evidence.

### III. DISPOSITION

The order extending defendant's commitment is affirmed.

/S/

RENNER, J.

We concur:

/S/

MAURO, Acting P. J.

/S/

DUARTE, J.